**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HOPE GLENN, as the personal
representative of the Estate of
Lukus Glenn,
                    *Plaintiff-Appellant,*

v.

WASHINGTON COUNTY; MIKHAIL
GERBA, an individual; TIM
MATESKI, an individual,
                    *Defendants-Appellees.*

No. 10-35636

D.C. No.
3:08-cv-00950-MO

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted
June 6, 2011—Portland, Oregon

Opinion Filed November 4, 2011
Amended December 27, 2011

Before: Raymond C. Fisher, Ronald M. Gould and
Richard A. Paez, Circuit Judges.

Opinion by Judge Fisher

## COUNSEL

Michael A. Cox (argued) and Lawrence K. Peterson, Law Office of Michael Cox, Tualatin, Oregon, for the plaintiff-appellant.

William G. Blair (argued), William G. Blair, PC, Beaverton, Oregon, for the defendants-appellees.

## ORDER

The panel acknowledges the amended table of contents in Appellees' corrected petition for rehearing, filed November 21, 2011. Appellees' motion for leave to file a corrected petition for rehearing is **DENIED**.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellees' petition for rehearing and petition for rehearing en banc, filed November 18, 2011, is **DENIED.**

The changes to the amended opinion filed concurrently with this order are non-substantive. Therefore, no further petitions for rehearing will be considered.

---

## OPINION

FISHER, Circuit Judge:

Eighteen-year-old Lukus Glenn was shot and killed in his driveway by Washington County police officers. His mother had called 911 for help with her distraught and intoxicated son after Lukus began threatening to kill himself with a pocketknife and breaking household property. Within four minutes of their arrival, officers had shot Lukus with a "less-lethal" beanbag shotgun, and had fatally shot him eight times with their service weapons. Lukus' mother filed suit against the officers and Washington County alleging a state law wrongful death claim and a 42 U.S.C. § 1983 claim for excessive force under the Fourth Amendment. The district court granted summary judgment to the defendants after concluding there was no constitutional violation. We reverse and remand for trial.

### BACKGROUND[1]

On September 15, 2006, Lukus Glenn left his home to attend a Tigard High School football game with his girlfriend. He had graduated from Tigard High a few months before and was living with his parents, Hope and Brad Glenn, and his grandmother. Lukus had no history of violence or criminal

---

[1]Because the plaintiff appeals the entry of summary judgment in the defendants' favor, to the extent there are factual disputes, the facts are presented in the light most favorable to the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

activity. He returned home at 3:00 a.m., agitated, intoxicated and intent on driving his motorcycle. His parents told him he could not take the motorcycle, and to their surprise Lukus became angry. He began to damage household property, including windows and the front door, and the windows of cars parked in the driveway. His parents had never seen Lukus drunk before, and believed they needed help to calm him down. They first called his friends, Tony Morales and David Lucas, who came over to the Glenn home. Lukus' friends were unable to calm him down, however, and his parents became alarmed when he held a pocketknife to his neck and threatened to kill himself.[2]

Frightened that Lukus would harm himself, Hope called 911 believing that "the police would have the expertise and experience to deal with an emotionally distraught teenager." The transcript of the 911 call states that Hope told the dispatcher her son was "out of control, busting our windows, and has a knife and is threatening us."[3] Hope clarified that the knife was "just a pocket knife" and that Lukus had not hurt anyone, and said he was "just really, really intoxicated." When the dispatcher asked if everyone could move away from Lukus, Hope said "well, yeah," but explained that they were "just trying to talk to him right now." She said Lukus was "threatening the knife to his neck and he keeps saying he's gonna kill himself if the cops come," and "he's not leaving until the cops shoot him and kill him."

Hope asked if paramedics could be sent to the house, remarking that Lukus was "so suicidal right now." She explained that she thought he had attempted suicide once before and had been "really depressed," but that "[h]e's

---

[2]The pocketknife had a three-inch blade and hooked tip.

[3]Hope says that she misspoke, and that Lukus never actually threatened anyone but himself. She also contends that the 911 transcript in the record is only a rough transcription, contains inaccuracies and does not fully convey a sense of the scene.

always been a good athlete and a good kid." In response to the dispatcher's questions, Hope said Lukus was born in 1988, was about 5'11" and had a thin build. She explained that he had damaged their windows and front door. She also said the family owned hunting rifles, but they were locked up and Lukus could not get to them.

The 911 dispatcher informed the Washington County Sheriff's Department that officers were needed at the Glenn home for a domestic disturbance involving a "fight with a weapon." Dispatch advised that "Caller has a son. Has a knife . . . It's a pocket knife. Glenn Lucas [sic] born in '88 . . . . Caller is advising he is probably going to kill himself if you show up." Officers were informed that there was no "premise history" and that Lukus was suicidal and "very intoxicated." Dispatch relayed that Lukus had broken a window and was out in the driveway. Officers were also told there were hunting rifles inside the house, but Lukus could not get to them. An officer can then be heard asking whether the Glenns could lock the doors since he "[doesn't] want [the son] going inside if there are guns in there," and dispatch responded that Lukus had "busted through the front door." A staging area for responding officers was established a short distance from the Glenn home.[4]

Deputy Mikhail Gerba was not on duty with the Washington County Sheriff's Department that night, but was working on a special assignment for the Oregon Department of Transportation performing traffic control for a construction project. He heard the dispatch, however, and responded. For some unknown reason, he skipped the staging area and went directly to the Glenn home, where he was the first officer to arrive on the scene at 3:11 a.m. Gerba initially encountered

___

[4]Written information on the officers' mobile data terminals similarly stated "son has a knife, broke a veh[icle] window, [it] is a pocketknife, sig[nal] II w[ith] tones, son is Glenn, Lukus, [born] 042288, . . . says he is not leaving till cops kill him, . . . hunting rifles in the house, he can't get to . . . friends are standing w/ him . . . [history] of su[icide] attempts."

David Lucas and, pointing his gun at David, ordered him to "[g]et on the fucking ground." David did as ordered and told Gerba that Lukus was "over there by the garage; we have him calmed down."

Gerba proceeded up the driveway and positioned himself eight to twelve feet from Lukus, who was standing by the garage near his parents and Tony Morales. Gerba had a completely unobstructed view of Lukus, who could be seen clearly under the garage light. Lukus was not in a physical altercation with anyone, nor was he threatening anyone with the pocketknife or in any other way, and no one was trying to get away from him. He was, however, holding the pocketknife to his own neck.

Gerba held his .40 caliber Glock semiautomatic pistol in "ready position, aimed at Lukus." From the moment he arrived, Gerba "only scream[ed] commands loudly at Lukus" such as "drop the knife or I'm going to kill you." As the district court recognized, Lukus may not have heard or understood these commands because he was intoxicated and many people were yelling at once. Gerba "did not attempt to cajol[e] or otherwise persuade Lukus to drop the knife voluntarily." Numerous witnesses described Gerba's behavior as "angry, frenzied, amped and jumpy," and noted that they were "shocked by how [he] approached this situation." Within a minute of Gerba's arrival, Hope began "begging the 911 operator, 'Don't let him shoot him. Please don't let him shoot him . . . . [T]hey're gonna shoot him.' " The dispatcher tried to reassure her that the police were "gonna try and talk to him," but Hope said "I shouldn't have called but I was so scared," "they're gonna kill him."

Washington County Deputy Timothy Mateski was the next officer to reach the scene, approximately one minute after Gerba's arrival. Mateski had initially headed toward the staging area, but rushed to the Glenn home when he heard from dispatch that Gerba had gone directly there. En route he asked

whether Hope and Brad could leave the house, and was advised that dispatch was checking. He never received a response, and did not follow up. Upon arrival, Mateski took a position six to twelve feet from Lukus, where he had a completely unobstructed view of Lukus. Like Gerba, "Mateski drew his gun and began screaming commands as soon as he arrived, including expletives and orders like 'drop the knife or you're going to die' " and "drop the fucking knife." Numerous witnesses described Mateski as "frantic and excited and only pursu[ing] a course of screaming commands at Luke." Tony Morales "implore[d] the officers to 'calm down' and t[old] them that Luke [wa]s only threatening to hurt himself." The officers ordered Morales to crawl behind them and ordered Hope and Brad to go into the house and close the door, which officers knew was broken and could not be locked. Everyone complied. Lukus' grandmother, who lived in a residence between the main house and garage, opened her door to come talk to Lukus. The officers ordered her back inside her home, and she complied. All of the people "in and around the house could have easily walked away from the scene to a spot behind the officers or even to the street behind without having to pass any closer to Luke than [they] already had been." Instead, they did as the officers instructed them to do. Having ordered the Glenns to go into their home, the officers could have positioned themselves between Lukus and the front door to the home without having to get any closer to Lukus, but they chose to stand elsewhere.

At about 3:14 a.m., Corporal Musser advised Mateski and Gerba that back-up was en route. Sergeant Wilkinson radioed that the officers on the scene should "remember your tactical breathing, and if you have leathal [sic] cover a taser may be an option if you have enough distance. Just tactical breathe, control the situation." Neither Mateski nor Gerba was carrying a taser or a beanbag gun. Shortly after these dispatch messages, however, Officer Andrew Pastore of the City of Tigard Police Department arrived with a beanbag shotgun and a

taser. Gerba and Mateski apparently were not aware that Pastore had a taser, and did not ask.

Mateski immediately ordered Pastore to "beanbag him." Pastore yelled "beanbag, beanbag" and opened fire on Lukus. Pastore shot all six of the shotgun's beanbag rounds. Gerba recalled that, "when [Lukus] got hit, I remember . . . he kind of cowered up against the garage and he kind of looked like, kind of like, did I just get hit with something?" The officers' brief acknowledges that Lukus "appeared surprised, confused, and possibly in pain." Numerous witnesses observed that, "[w]hile being struck by beanbag rounds, Luke put his hands down, grabbed his pants and began to move away from the beanbag fire toward the alcove between the house and garage . . . in the most obvious line of retreat from the fire." Mateski and Gerba stated in their declarations that they had independently determined that if Lukus made a move toward the house with his parents inside, they would use deadly force.[5]

After Lukus took one or two steps, Gerba and Mateski began firing their semiautomatic weapons at him. They fired eleven shots, eight of which struck Lukus in the back, chest, stomach, shoulder and legs. The remaining three bullets struck his grandmother's residence. All the lethal fire occurred before the last beanbag round was fired, and less than four minutes after the first officer arrived on the scene. Seconds before he was fired upon, Lukus "pled[,] 'Tell them to stop screaming at me' " and "why are you yelling?" Lukus bled out and died on his grandmother's porch shortly after he was shot.

In April 2007, Washington County Sheriff Rob Gordon

---

[5]The district court determined that "Lukus could not have headed in the direction of the alcove without also heading in the direction of his parents' front door." Glenn argues that it is possible Lukus did not make any volitional movement at all, but rather was "moved by . . . the onslaught of beanbag fire."

released to the public an Administrative Review of the Lukus Glenn shooting. The review concluded that "[n]o policies were violated during this critical incident," and that the "WCSO deputies involved in this incident performed as trained, followed established policies, and acted in a professional manner."

In August 2008, Hope Glenn filed a complaint against the defendants in her capacity as personal representative of Lukus' estate.[6] The complaint included an Oregon state law wrongful death claim and a 42 U.S.C. § 1983 claim for excessive force. The defendants moved for summary judgment, which the district court granted in June 2010. The court, acknowledging the tragedy of Lukus' death, nonetheless felt it had to conclude "that the officers' use of force did not violate Lukus Glenn's Fourth Amendment rights," and therefore that the defendants were entitled to qualified immunity. The district court issued an amended opinion granting the defendants' motion for summary judgment on all claims. This timely appeal followed.

## DISCUSSION

## I.

We have jurisdiction under 28 U.S.C. § 1291. We review a district court's decision to grant summary judgment de novo, considering all facts in dispute in the light most favorable to the nonmoving party. *See Mena v. City of Simi Valley*, 226 F.3d 1031, 1036 (9th Cir. 2000). "Summary judgment is appropriate only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " *Stoot v. City of*

---

[6]Pastore and the City of Tigard were voluntarily dismissed as defendants on May 18, 2010. The remaining defendants are Mateski, Gerba and Washington County.

*Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). The de novo standard also applies to our review of the defendant officers' entitlement to qualified immunity as a matter of law. *See Mena*, 226 F.3d at 1036.

## II.

In evaluating a grant of qualified immunity, we ask two questions: (1) whether, taking the facts in the light most favorable to the nonmoving party, the officers' conduct violated a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). Either question may be addressed first, and if the answer to either is "no," then the officers cannot be held liable for damages. *See Pearson*, 555 U.S. at 236. In this case, the district court focused on whether the officers' use of force violated Lukus' Fourth Amendment rights, and held that it did not. Glenn argues on appeal that the district court erred in granting summary judgment on that basis. We agree that genuine issues of fact remain, and accordingly reverse. We further conclude that resolution of these issues is critical to a proper determination of the officers' entitlement to qualified immunity. We express no opinion as to the second part of the qualified immunity analysis and remand that issue to the district court for resolution after the material factual disputes have been determined by the jury.[7]

---

[7]*See, e.g.*, *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming a denial of summary judgment on qualified immunity grounds because "there are genuine issues of fact regarding whether the officers violated [the plaintiff's] Fourth Amendment rights[, which] are also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions"); *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (finding it premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom").

## A.

**[1]** In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Reasonableness therefore must be judged from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).

"Our analysis involves three steps. First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.' " *Espinosa*, 598 F.3d at 537 (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "[E]ven where some force is justified, the amount actually used may be excessive." *Santos*, 287 F.3d at 853. Second, we evaluate the government's interest in the use of force. *Graham*, 490 U.S. at 396. Finally, "we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller*, 340 F.3d at 964.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en

banc) (alteration in original) (internal quotation marks omitted); *see also Espinosa*, 598 F.3d at 537 ("[T]his court has often held that in police misconduct cases, summary judgment should only be granted 'sparingly' because such cases often turn on credibility determinations by a jury."). We hold that there remain questions of fact regarding the reasonableness of the officers' actions that preclude summary judgment.

### 1.

**[2]** First we consider the quantum of force used when officers shot Lukus with the beanbag shotgun. A beanbag shotgun is "a twelve-gauge shotgun loaded with . . . 'beanbag' round-[s]," which consist of "lead shot contained in a cloth sack." *Deorle v. Rutherford*, 272 F.3d 1272, 1277 (9th Cir. 2001). It is "intended to induce compliance by causing sudden, debilitating, localized pain, similar to a hard punch or baton strike." "Although bean bag guns are not designed to cause serious injury or death, a bean bag gun is considered a 'less-lethal' weapon, as opposed to a non-lethal weapon, because the bean bags can cause serious injury or death" "if they hit a relatively sensitive area of the body, such as [the] eyes, throat, temple or groin." In *Deorle*, we observed that the euphemism "beanbag" "grossly underrates the dangerousness of this projectile," which "can kill a person if it strikes his head or the left side of his chest at a range of under fifty feet." *Id.* at 1279 & n.13. Indeed, the plaintiff in *Deorle* suffered multiple cranial fractures and the loss of an eye as a result of being shot with a beanbag gun from approximately 30 feet away. *See id.* at 1277-78 & n.11. In light of this weapon's dangerous capabilities, "[s]uch force, though less than deadly, . . . is permissible only when a strong governmental interest compels the employment of such force." *Id.* at 1280.

### 2.

The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) "whether

the suspect poses an immediate threat to the safety of the officers or others," (2) "the severity of the crime at issue," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These factors, however, are not exclusive. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). We "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.' " *Id.* (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed. *See, e.g.*, *Bryan*, 630 F.3d at 831; *Deorle*, 272 F.3d at 1282-83.

[3] The "most important" factor is whether the individual posed an "immediate threat to the safety of the officers or others." *See, e.g.*, *Bryan*, 630 F.3d at 826 (internal quotation marks omitted). The district court held that the officers "were justified in using less-than-lethal force to prevent [Lukus'] suicide." The case the court cited in support of that proposition, however, does not involve a § 1983 claim, but rather addresses the constitutionality of a statute prohibiting assisted suicide. *See Compassion in Dying v. Washington*, 79 F.3d 790 (9th Cir. 1996) (en banc), *rev'd sub nom. Washington v. Glucksberg*, 521 U.S. 702 (1997). Although *Graham* does not specifically identify as a relevant factor whether the suspect poses a threat to *himself*, we assume that the officers could have used some reasonable level of force to try to prevent Lukus from taking a suicidal act. But we are aware of no published cases holding it reasonable to use a *significant* amount of force to try to stop someone from attempting suicide. Indeed, it would be odd to permit officers to use force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself. We do not rule out that in some circumstances some force might be warranted to prevent suicide, but in cases like

this one the "solution" could be worse than the problem. On the facts presented here, viewed favorably to the plaintiff, the officers' use of force was not undisputably reasonable.

**[4]** The district court also held that the officers were justified in shooting Lukus with the beanbag gun because he posed an immediate threat to officers and bystanders. In coming to this conclusion, the district court relied primarily on Lukus' possession of a knife. Although there is no question this is an important consideration, it too is not dispositive. Rather, courts must consider "the totality of the facts and circumstances in the particular case"; otherwise, that a person was armed would always end the inquiry. *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1115 (9th Cir. 2005). The district court mischaracterized our case law as establishing that "when a suspect was armed with a deadly weapon, . . . the officers' use of force [was reasonable] as a matter of law — even when the suspect 'had not committed a significant crime or threatened anyone' and no identifiable bystanders were present." In each of the cases the district court cited — *Blanford*, 406 F.3d at 1115-19, *Long v. City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007), and *Scott v. Henrich*, 39 F.3d 912, 914-15 (9th Cir. 1994) — we engaged in a context-specific analysis rather than resting our holding on the single fact that the suspect was armed.

Further, in each of those cases, the suspect had a more dangerous weapon than Lukus and wielded it in a more threatening manner. In *Blanford*, for example, the suspect was armed with a 2-1/2 foot sword, and when officers ordered him to put it down, he instead "raised his sword and growled." 406 F.3d at 1116. In *Long*, the suspect, who officers knew had already shot two people, carried a .22 caliber rifle and, just before being fired upon by officers, raised his rifle to chest level and shouted "I told you fuckers to get the fuck back. Have some of this." 511 F.3d at 904-05. And in *Scott*, the suspect "held a 'long gun' and pointed it at" officers. 39 F.3d at 914. Lukus,

by contrast, had a pocketknife with a three-inch blade, which he did not brandish at anyone, but rather held to his own neck.

**[5]** Here, although Lukus did not respond to officers' orders to put the knife down during the approximately three minutes that elapsed before he was shot with the beanbag gun, a number of other circumstances weigh against deeming him "an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. By all accounts Lukus was suicidal on the night in question and the threats of violence known to the responding officers focused on harming himself rather than other people. Although Hope told the 911 operator that Lukus "was threatening to kill everybody" and might "run at the cops with a knife," the district court correctly recognized it must be assumed on summary judgment that the officers on the scene did not know of such statements.[8] They had, however, been informed that Lukus was intoxicated and emotionally disturbed, and that he was the teenage son of the homeowners rather than an intruder or criminal. They also knew there was no history of 911 calls to the Glenn home, Lukus was not wanted for any crime and he was not in possession of any guns.

When Officer Gerba arrived on scene, Lukus was standing outside his home talking with his parents and friends, all of whom stood near him. He was "not in a physical altercation with anyone," "[h]e was not threatening anyone with the knife," and "[n]o one [wa]s trying to get away from" him. The only person with any injury was Lukus himself, whose hand was bleeding. Both Mateski and Gerba had unobstructed views of Lukus and stood with their weapons aimed at him.

---

[8]We disagree with the district court's suggestion that, even though we must assume the officers did not know of these statements, they provide "uncontroverted evidence demonstrat[ing] that the officers' safety concerns were not at odds with information provided to law enforcement." We cannot consider evidence of which the officers were unaware — the prohibition against evaluating officers' actions "with the 20/20 vision of hindsight" cuts both ways. *Graham*, 490 U.S. at 396.

From the moment they arrived, although Lukus did not heed orders to put down the pocketknife, he "did not attack the officers; indeed at no time did he even threaten to attack any of them," or anyone else. *Smith*, 394 F.3d at 703. Tony Morales asked officers to "calm down," telling them that Lukus was "only threatening to hurt himself." Furthermore, at the officers' direction, Hope and Brad went inside their home and Morales and David Lucas moved behind the officers, so a jury could conclude that no one was close enough to Lukus to be harmed by him before police could intervene.

**[6]** Accordingly, a jury could conclude that at the time Pastore arrived with the beanbag gun approximately three minutes into the encounter, there was little reason to believe Lukus could have done any immediate harm to anyone. Lukus stood in the driveway several feet from the officers (who could have moved farther away at any time, had they wanted to), with guns trained on him, while his friends stood behind the officers and his parents and grandmother were in their homes. By all accounts, Lukus stayed in the same position from the moment officers arrived and showed no signs of attempting to move until after he was fired upon. At the time the officers elected to shoot Lukus with the beanbag rounds, only two things about the situation had changed from the time of their arrival: (1) the four people who previously had been standing near Lukus had moved away from him to locations either behind the officers or inside the house, arguably decreasing the threat Lukus posed, and correspondingly the need for force; and (2) the beanbag shotgun had arrived. No new action by Lukus precipitated the use of less-lethal force. Viewing the evidence in the light most favorable to the plaintiff, even though Lukus remained in possession of the pocketknife, a jury could conclude that at the moment the officers shot him with the beanbag gun there was little evidence that he posed an "immediate threat" to anybody. *Graham*, 490 U.S. at 396.

**[7]** The "character of the offense" committed by the suspect is also "often an important consideration in determining whether the use of force was justified." *Deorle*, 272 F.3d at 1280. Viewing the facts in the light most favorable to the plaintiff, the "crime at issue" in this case was not "sever[e]" by any measure. *Graham*, 490 U.S. at 396. Indeed, Lukus' family did not call the police to report a crime at all, but rather to seek help for their emotionally disturbed son. *See Deorle*, 272 F.3d at 1280-81 (noting that officers were called "not to arrest him, but to investigate his peculiar behavior [as] Deorle was clearly a deeply troubled, emotionally disturbed individual"). Neither the district court nor the defendants have identified any crime that Lukus committed.[9]

**[8]** Next, we consider whether Lukus was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. No one contends that Lukus tried to flee before officers shot him with the beanbag gun. Whether Lukus was "actively resisting arrest" is more complicated.

---

[9]We recognize that the defendants could argue at trial that Lukus threatened his family, or that Lukus obstructed the officers by refusing to follow their orders, and thereby violated the law. These are disputed facts, however, which we must resolve in the plaintiff's favor. There is evidence from which a jury could conclude that Lukus never threatened anyone but himself, and that Lukus could not hear or understand the officers' commands.

We do not diminish the importance of crimes such as those Lukus might be argued to have committed, but we have previously concluded that similar offenses were not "severe" within the meaning of the *Graham* analysis. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (noting that trespassing and obstructing a police officer were not severe crimes); *Smith*, 394 F.3d at 702 (concluding that a suspect was not "particularly dangerous" and his crimes were not "especially egregious" where police were called because he was " 'hitting [his wife] and/or was physical with her' "); *Deorle*, 272 F.3d at 1277, 1281-82 (noting that "the crime being committed, if any, was minor" where the suspect was charged with obstructing the police in the performance of their duties after brandishing a hatchet and crossbow at police officers and threatening to "kick [their] ass").

Significantly, "he did not attack the officers" or anyone else, nor did he threaten to do so at any point while officers were on the scene. *Smith*, 394 F.3d at 703. Rather, he stayed in the same position from the time officers arrived and took no threatening actions (other than noncompliance with shouted orders). However, he remained in possession of the pocket-knife despite officers' commands to put it down. As the district court recognized, though, it is not clear Lukus heard or understood those orders.

In *Deorle*, the plaintiff "brandish[ed] a hatchet" and a crossbow and was verbally abusive to officers, threatening to "kick [their] ass." 272 F.3d at 1276-77. He also continually roamed about his property despite officers' orders. *Id.* Nonetheless, we did not consider this sufficient active resistance to warrant use of the beanbag shotgun. *Id.* at 1282-85. Rather, we noted that "the crime being committed, if any, was minor." *Id.* at 1282. Similarly, in *Smith*, 394 F.3d at 703, we held that the plaintiff's refusal to obey officers' commands to remove his hands from his pockets to show police whether he was armed, as well as his entry into his home despite officers' orders and his brief physical resistance were "not . . . particularly bellicose." *Smith* is similar to this case in that the crux of the resistance was the refusal to follow officers' commands, rather than actively attacking or threatening officers or others. Lukus, however, had a pocketknife, whereas police ultimately determined that Smith was unarmed. We take note of Washington County's own guidelines in considering how this distinction should affect our analysis. *See, e.g.*, *id.* at 701-02 (discussing the "Hemet Police Department's use of force policy" in analyzing the *Graham* factors).

**[9]** Washington County's use of force continuum identifies five levels of resistance, ranging from least to most resistant: verbal, static, active, ominous and lethal. Applying Washington County's definitions to the facts viewed in the light most favorable to Glenn, Lukus falls under the "static" resistance category, where the suspect "refuses to comply with com-

mands . . . [and] has a weapon but does not threaten to use it." According to Washington County guidelines, officers can employ various types of force in response to static resistance, including takedown methods, electrical stun devices and pepper spray. Use of less-than-lethal munitions, however, is unauthorized unless a suspect exhibits "ominous" or "active" resistance, which entails "pull[ing] away from a deputy's grasp, attempt[ing] to escape, resist[ing] or counter[ing] physical control," or "demonstrat[ing] the willingness to engage in combat by verbal challenges, threats, aggressive behavior, or assault." Accordingly, when viewing the facts in the light most favorable to the plaintiff, the defendants' own guidelines would characterize Lukus' conduct as less than active resistance, not warranting use of a beanbag shotgun.

**[10]** Another circumstance relevant to our analysis is whether the officers were or should have been aware that Lukus was emotionally disturbed. *See Deorle*, 272 F.3d at 1283. Viewing the facts in the required light, it is clear that, as the district court recognized, Lukus was obviously "emotionally disturbed, a factor to which the officers should have assigned greater weight." Dispatch informed officers that Lukus (1) was suicidal and very intoxicated, (2) had a history of suicide attempts, and (3) was the son of the caller rather than a criminal intruder. This information was confirmed when officers arrived and found Lukus holding a knife to his own neck and threatening to harm himself, rather than brandishing it at his parents or friends, who were standing nearby. Indeed, at least one person on the scene explicitly told officers that Lukus was "only threatening to hurt himself." "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force," "the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Id.* This was the situation officers confronted in this case.

**[11]** We also consider whether officers gave a warning before employing the force. *See Bryan*, 630 F.3d at 831; *Deorle*, 272 F.3d at 1272. "Appropriate warnings comport with actual police practice" and "such warnings should be given, when feasible, if the use of force may result in serious injury." *Deorle*, 272 F.3d at 1284. In this case, more than once Gerba and Mateski yelled warnings like "drop the fucking knife or I'm going to kill you," but, as the district court noted, "Lukus may not have heard or understood these warnings" because he was intoxicated and there were other people yelling. Further, these warnings were given before Pastore arrived with the beanbag shotgun. It appears that the only warning given immediately before the beanbag shotgun was fired was when Pastore yelled "beanbag, beanbag." Possibly, Lukus did not know what this statement meant, or perhaps even what a beanbag shotgun was. The officers concede that after being hit with the beanbag rounds Lukus "appeared surprised, confused, and possibly in pain," and Lukus may even have thought he was being shot at with live lethal rounds given the officers' previous threats of deadly force. Confusion regarding whether his life was in immediate danger may have led Lukus to seek cover rather than surrender.

**[12]** Finally, we consider whether there were less intrusive means of force that might have been used before officers resorted to the beanbag shotgun. Officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Henrich*, 39 F.3d at 915. However, "police are 'required to consider [w]hat other tactics if any were available,' " and if there were "clear, reasonable and less intrusive alternatives" to the force employed, that "militate[s] against finding [the] use of force reasonable." *Bryan*, 630 F.3d at 831 (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000)); *see also Smith*, 395 F.3d at 703 (considering "alternative techniques available for subduing him that presented a lesser threat of death or serious injury").

Glenn identifies various less intrusive options that she argues were available to the officers. She suggests that rather than immediately drawing their weapons and shouting commands and expletives at Lukus, which predictably escalated the situation instead of bringing it closer to peaceful resolution, officers could have attempted the tactics of "persuasion" or "questioning." These tactics appear on the Washington County use of force continuum, and the 911 dispatcher assured Hope that the officers would "try and talk to [Lukus]." Glenn also argues that the officers also could have "use[d] time as a tool," given that they knew backup officers were en route and that the situation appeared static. Instead, officers shot Lukus with numerous beanbag rounds approximately three minutes into the encounter, and had shot him to death within four minutes of their arrival.

**[13]** We have made clear that the "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281. We also recognized in *Deorle* that when dealing with an emotionally disturbed individual who is creating a disturbance or resisting arrest, as opposed to a dangerous criminal, officers typically use less forceful tactics. *See id.* at 1282. This is because when dealing with a disturbed individual, "increasing the use of force may . . . exacerbate the situation," unlike when dealing with a criminal, where increased force is more likely to "bring[ ] a dangerous situation to a swift end." *Id.* at 1283. The facts of this case, viewed in the light most favorable to the plaintiff, bear this out: Lukus did not respond positively to the officers' forceful tactics, and just before officers fired the beanbag gun, Lukus "pled: 'Tell them to stop screaming at me,' " and "why are you yelling?"

In support of her arguments, Glenn offers the statements of an expert witness, a former Bellevue, Washington Chief of Police with a law enforcement career spanning more than 50 years. It was his "considered professional opinion that the

[defendants] escalated a static situation into an unnecessary and avoidable shooting." We have held en banc that "[a] rational jury could rely upon such [expert] evidence in assessing whether the officers' use of force was unreasonable." *Smith*, 394 F.3d at 703 (reversing district court's grant of qualified immunity).

In the expert's opinion, the "fundamental rules for approaching" a situation like the one the officers faced are: "1) Slow it down, 2) Do not increase the subject's level of anxiety or excitement, 3) Attempt to develop rapport, 4) Time is on the side of the police." The expert pointed out that Sergeant Wilkinson had specifically advised the responding officers to "[r]emember your tactical breathing," and "control the situation" — advice Wilkinson explained was meant to "help [the officers] control themselves if possible while dealing with a stressful situation." Instead, "[w]ith no attempt at establishing any dialogue whatsoever," "[t]he shooters began loudly and continuously yelling at the decedent." "3 minutes and 49 seconds later, Officer Pastore began firing 6 impact projectiles at him," and "[a]fter only 9 more seconds and before all of the impact projectiles had been fired, the shooters began rapidly firing a total of 11 shots." In the expert's opinion, "[t]he rapidity of the time sequence is particularly illustrative of th[e] too hasty and escalating approach to a person in crisis."

Finally, Glenn argues that the officers should have used a taser before employing the beanbag shotgun. Washington County considers electrical stun devices to be lesser force than less-lethal munitions. Sergeant Wilkinson suggested over dispatch that "a taser may be an option if you have enough distance," and Tony Morales also suggested that the officers try tasing Lukus. Plaintiff's expert opined that the taser "was the ideal less-lethal option to temporarily disable the decedent, at approximately 15 feet away, and take him into custody." He came to this conclusion because beanbag shotgun rounds "are generally inaccurate, rely solely on pain for com-

pliance that will also motivate the target to escape and do not have a high degree of reliability," whereas the taser "actually immobilizes the target, is accurate out to 21 feet and has a high degree of reliability."

[14] Neither Gerba nor Mateski had a taser on the night in question, but Pastore did. It appears Gerba and Mateski did not know that, and never asked. The district court cited several reasons the defendants offered for their decision to use a beanbag shotgun rather than a taser, such as that Lukus' position and distance relative to the officers would have made firing the taser difficult. But there was conflicting evidence on these points, so on summary judgment we must assume that a taser would have been a feasible option. Although a jury could ultimately disagree that the officers were in optimal taser range or that use of a taser was otherwise feasible or preferable, these are disputed questions of fact.[10]

We do not suggest that the officers were required to attempt any of the various purportedly less intrusive alternatives to the beanbag shotgun. As we have explained, it is well settled that officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct. *See Henrich*, 39 F.3d at 915. The available lesser alternatives are,

---

[10]We do not suggest that it would have necessarily been reasonable for the officers to use a taser here. "[W]hether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). This is a fact-specific inquiry, and reasonableness is determined based on the totality of the circumstances. The reasonableness of the use of a taser here would depend on a balancing of the *Graham* factors. *See Mattos v. Agarano*, ___ F.3d ___, 2011 WL 4908374, at *7-*16 (9th Cir. Oct. 17, 2011) (en banc) (applying the *Graham* factors and concluding that use of a taser was unreasonable under the circumstances). We need not conduct such an analysis at this stage, because regardless of whether the force used would have been upheld as reasonable, it was a less intrusive alternative to the beanbag shotgun.

however, relevant to ascertaining that reasonable range of conduct. *See Bryan*, 630 F.3d at 831. Accordingly, the availability of those alternatives is one factor we consider in the *Graham* calculus.

**3.**

**[15]** Balancing these various considerations, we hold that the district court erred in granting summary judgment on the constitutionality of the officers' use of force. We recognize that the officers have offered evidence that could support a verdict in their favor. A jury could view the facts as the district court did, and likewise reach the conclusion that the officers' use of force was reasonable. But on summary judgment, the district court is not permitted to act as a factfinder. The circumstances of this case can be viewed in various ways, and a jury should have the opportunity to assess the reasonableness of the force used after hearing all the evidence. *See Smith*, 394 F.3d at 701 (noting that " 'summary judgment . . . in excessive force cases should be granted sparingly' " because such cases " 'nearly always' " involve disputed facts); *see also Espinosa*, 598 F.3d at 537. Because the disputed facts and inferences could support a verdict for either party, we are compelled to reverse the district court's entry of summary judgment.

**B.**

**[16]** As the district court recognized, "the officers' decision to employ the beanbag gun is critical to the resolution of" the reasonableness of the lethal force as well "[b]ecause the use of less-lethal force precipitated the use of deadly force." Before Lukus was shot with the beanbag shotgun, he had not moved from the position he was in at the time officers arrived, and showed no signs of attempting to do so. He moved only after being struck by the beanbag rounds, which have sufficient force to "knock[ ] [someone] off his feet." *Deorle*, 272 F.3d at 1279. Lukus' movement in reaction to the beanbag

fire — which a jury could conclude was a predictable conse-
quence of using the beanbag shotgun — prompted the offi-
cers' lethal force.

[17] "[W]here an officer intentionally or recklessly pro-
vokes a violent confrontation, if the provocation is an inde-
pendent Fourth Amendment violation, he may be held liable
for his otherwise defensive use of deadly force." *Billington v.
Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); *see also
Espinosa*, 598 F.3d at 548 ("[E]ven though the officers rea-
sonably fired back in self-defense, they could still be held lia-
ble for using excessive force because their reckless and
unconstitutional provocation created the need to use force.").
Because there is a triable issue of whether shooting Lukus
with the beanbag shotgun was itself excessive force, under
*Billington* there is also a question regarding the subsequent
use of deadly force. Even assuming, as the district court con-
cluded, that deadly force was a reasonable response to Lukus'
movement toward the house, a jury could find that the bean-
bag shots provoked Lukus' movement and thereby precipi-
tated the use of lethal force. If jurors conclude that the
provocation — the use of the beanbag shotgun — was an
independent Fourth Amendment violation, the officers "may
be held liable for [their] otherwise defensive use of deadly
force." *Billington*, 292 F.3d at 1189.

Even if the jury determines that the use of "less-lethal"
force was justifiable, however, the question still remains
whether escalating so quickly to deadly force was warranted.
The critical issue is whether Lukus posed an immediate safety
risk to others. "In deadly force cases, '[w]here the suspect
poses no immediate threat to the officer and no threat to oth-
ers, the harm resulting from failing to apprehend him does not
justify the use of deadly force to do so.' " *Espinosa*, 598 F.3d
at 537 (quoting *Garner*, 471 U.S. at 11-12).

Even before the final beanbag round was fired, the officers
began firing a total of 11 shots at Lukus, eight of which struck

him, causing him to bleed to death on his grandmother's porch within minutes. The officers argue they were justified in resorting to deadly force because Lukus had begun to move toward the house where his parents were located, and the officers knew the front door had a broken lock. Thus, they reasonably feared that he could have attacked his parents with the knife so they shot Lukus to protect his family.

Glenn counters that Lukus was not running toward the front door to attack his family, but instead took one or two steps seeking cover from the beanbag rounds by moving in the most obvious line of retreat, and was shot without warning. Glenn contends that Lukus may not even have taken an intentional step but instead was "moved by . . . the onslaught of beanbag fire." Glenn further argues that the officers' professed concern for Hope and Brad's safety was unreasonable given that Lukus had up to that point not attempted to attack anyone, and had been threatening suicide rather than exhibiting any inclination to harm his family. Moreover, had the officers been so concerned with the Glenns' safety, Glenn argues, they could easily have positioned Hope and Brad behind the officers, as they did with Tony Morales and David Lucas, rather than ordering them into the house with its broken door. Alternatively, the officers could have positioned themselves between Lukus and the front door.

**[18]** As with the use of beanbags, there are material questions of fact about Lukus' and the officers' actions that preclude a conclusion that the officers' rapid resort to deadly force was reasonable as a matter of law. Again, the disputed facts and inferences could support a verdict for either party, and the jury must resolve these factual disputes. Accordingly, we reverse the district court's summary judgment on the use of lethal force.

## III.

**[19]** Glenn also appeals the dismissal of her claim against Washington County under *Monell v. Department of Social*

*Services*, 436 U.S. 658 (1978). "Pursuant to 42 U.S.C. § 1983, a local government may be liable for constitutional torts committed by its officials according to municipal policy, practice, or custom." *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (citing *Monell*, 436 U.S. at 690-91). Alternatively, "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). The district court's dismissal of Glenn's *Monell* claim was based entirely on the erroneous entry of summary judgment in the defendants' favor on the excessive force question. Accordingly, we remand to the district court for consideration of whether Glenn's *Monell* claim can properly be resolved on summary judgment even if the constitutional violation question cannot.

[20] We also reverse and remand for reconsideration of whether Glenn's state law wrongful death claim could properly be resolved on summary judgment. The district court appears to have assumed that Oregon law and § 1983 are coextensive, and rejected Glenn's state law claims "[i]n light of [its] decision that the officers' two acts of force were constitutionally reasonable." The defendants likewise argue on appeal that once the district court determined the officers' conduct was objectively reasonable under federal law, Oregon's justification statutes provided an affirmative defense permitting summary judgment on the state law claims as well. Glenn counters that the justification statutes are not applicable and liability under Oregon law is broader than under federal law. *Cf. Billington*, 292 F.3d at 1190 ("The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law . . . . An officer may fail to exercise 'reasonable care' as a matter of tort law yet still be a constitutionally 'reasonable' officer."). We need not resolve this question of Oregon law because, in either event, our reversal of the summary judgment on the § 1983 claim

also requires reversal of the summary judgment on the wrongful death claim.

## CONCLUSION

We reverse the entry of summary judgment on all claims and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**