Filed 5/26/21  O.G. v. City of L.A. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| O.G., a Minor, etc., et al., | B299186 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC663056) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen M. Moloney, Judge.  Affirmed.

Guizar, Henderson & Carrazco, Angel Carrazco, Jr., and Kent M. Henderson for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Deputy City Attorney, Scott Marcus, Blithe S. Bock, Assistant City Attorneys, and Michael M. Walsh, Deputy City Attorney, for Defendants and Respondents.

The Estate of Omar Gonzalez; O.G., a minor by and through his guardian ad litem Zoila Gutierrez; and M.G., a minor by and through his guardian ad litem Zoila Gutierrez (collectively, appellants) appeal from a judgment following a jury trial in this wrongful death lawsuit brought by appellants against the City of Los Angeles and Eden Medina (Officer Medina) (collectively, respondents). At the time of trial, appellants' remaining causes of action against respondents were wrongful death based on negligence and wrongful death based on battery, each of which focused on whether Officer Medina's use of force was reasonable under the circumstances. After hearing the evidence, the jury returned a unanimous defense verdict.

On appeal, appellants claim that the trial court committed reversible error by denying appellants' motion in limine to exclude evidence that Omar Gonzalez tested positive for methamphetamine postmortem. Appellants claim such evidence was irrelevant and highly prejudicial. Appellants also argue that the trial court erred in permitting the expert testimony of Richard Clark, M.D.; the laboratory results; and laboratory and chain of custody witness declarations of Robert W. Middleberg, Ph.D., and Sara Eskandary. Finally, appellants argue that the trial court erred in admitting evidence of drug paraphernalia.

Finding no error, we affirm the judgment.

## FACTUAL BACKGROUND

On July 28, 2016, Los Angeles Police Officer Medina shot and killed Gonzalez following a car and foot pursuit. Officer Medina and his partner, Officer Higareda, were in full uniform in a marked black and white police vehicle working in a gang enforcement detail. Officer Medina was wearing a body-worn

2

video (BWV) and the police vehicle he and his partner used was equipped with digital in-car video.  Upon information that another unit was attempting a traffic stop a few blocks away, Officer Medina and his partner went to assist.  The suspect vehicle, in which Gonzalez was a passenger, refused to stop, resulting in a low speed chase.  A radio report informed the officers they were pursuing a possible stolen car and that Gonzalez appeared to be bending and reaching inside the car, potentially arming himself.  In addition, the passenger door to the suspect vehicle opened periodically, suggesting that the passenger might attempt to flee or attempt to engage with the officers.  Based on his observations of Gonzalez throughout the incident, Officer Medina believed that Gonzalez was not "thinking rational" and was possibly under the influence of a narcotic.

The officers' pursuit of the suspect vehicle ended after it drove into a dead-end street and came to a stop.  Gonzalez exited the passenger side of the vehicle and began running up a driveway.  Officer Medina observed Gonzalez's hand go to his front waistband, which caused Officer Medina to continue to suspect that Gonzalez was armed.

The driver of the suspect vehicle remained in the car.  Because Officer Medina was the officer driving, police training required that he move to the driver's side of the suspect vehicle, which he did.  His partner went on foot in pursuit of Gonzalez.  When Officer Medina heard another officer at the scene state, "Go with your partner," he followed his partner in foot pursuit up the driveway.

At the top of the driveway Gonzalez confronted the Avila family, who lived at the residence and had become aware of the

3

police activity.  The Avila family did not know Gonzalez and were scared that Gonzalez might attack them.  They told Gonzalez to get out of there, but he continued charging up the driveway and put his hands on Mrs. Avila, resulting in a scuffle with Mrs. Avila and a neighbor.  Mr. Avila observed Gonzalez reaching towards his waistband area and understood that Gonzalez was threatening that he had a gun.  Mr. Avila felt that Gonzalez was communicating "get out of my way or I'm going to pull it out."  Mr. Avila was scared Gonzalez was going to shoot them.  When Officer Medina observed Gonzalez in an altercation with these citizens, he continued to believe that Gonzalez was under the influence of a narcotic.

Officer Higareda and another officer on the scene attempted to subdue Gonzalez by holding him down against a fence while trying to handcuff him.  Officer Higareda was on Gonzalez's back, and Officer Dameworth was on Gonzalez's right side.  Officer Medina went to Gonzalez's left side in an effort to gain control of his left arm.  Gonzalez was actively resisting the officers' efforts to arrest him.  Officer Medina observed that Gonzalez was showing "tremendous strength, more than your average individual when he was resisting."  This fact supported Officer Medina's continued belief that Gonzalez was under the influence of "some type of narcotic."[1]

During the scuffle Gonzalez was favoring his left side and had his left arm tucked in, so it was not visible.  After one officer called out, "I can't see his left hand," Officer Medina grabbed what he believed to be Gonzalez's left forearm and saw that he

---

[1]     Gonzalez's sons testified that they were surprised to see their father acting as he did in the videos of the event.

was holding a gun by the side. Gonzalez continued to actively resist Officer Medina and the other officers. Officer Medina yelled "gun" three or four times to alert the other officers that Gonzalez was in possession of a firearm. Officer Medina continued to attempt to control Gonzalez's left arm and dislodge the gun. Eventually the gun fell out of Gonzalez's hand into a water channel. Gonzalez then pulled away from Officer Medina's grip and reached down and picked up the gun. At that point Officer Medina had no doubt that Gonzalez was determined to use the gun, and he believed that the situation had escalated to one that called for the use of deadly force.

In response to this perceived imminent deadly threat, Officer Medina drew his gun and told Gonzalez, "Let it go, dude." Gonzalez appeared to be trying to get a better grip on his gun. Having lost control of Gonzalez's left arm, Officer Medina believed it was impractical to then attempt to regain control after Gonzalez had already reacquired the gun. When Officer Medina fired his first shot Gonzalez was still holding his gun with his left hand, and his left arm was on top of a ledge. After Officer Medina fired his first round, Gonzalez still did not drop the gun. After Officer Medina fired a second time, Gonzalez dropped the gun and it fell on the ledge. After Gonzalez dropped the gun Officer Medina did not fire again, although he had 16 rounds left. Gonzalez continued to fail to follow the officers' instructions while the officers handcuffed him. Officer Higareda sought to recover the firearm at that time because he believed it would not take much for Gonzalez to again arm himself. Gonzalez later died from the gunshot wounds.[2]

---

[2] At trial appellants disputed Officer Medina's account of the events surrounding the gun. However, appellants do not present

# PROCEDURAL HISTORY

## Complaints

Appellants filed their complaint against respondents for wrongful death and civil rights violations on May 26, 2017. On August 4, 2017, they filed a first amended complaint, which included causes of action for wrongful death, false arrest, and false imprisonment. At the time of trial, the causes of action that remained were wrongful death based on negligence and wrongful death based on battery.

## Motion in limine No. 3

On February 21, 2019, appellants filed their motion in limine No. 3 to exclude drug and alcohol test results, under the influence, drug use history, drugs found at scene, etc. Through the motion, appellants sought to exclude all evidence of Gonzalez's drug and alcohol use, whether before or during the incident, including lab results from NMS Labs showing that there were high levels of methamphetamine in Gonzalez's system during the incident. Appellants argued that such evidence was irrelevant, highly prejudicial as character evidence, and that respondents had failed to designate the necessary experts to support the test results. They further claimed that the test results were inadmissible hearsay.

Respondents opposed the motion, noting that their supplemental expert disclosure included Dr. Clark, a retained medical specialist in emergency medicine and toxicology, and Middleberg, the laboratory director of NMS Labs, a nonretained

---

their version of events in this appeal, nor do they provide any citations to the record showing evidence contradicting Officer Medina's version of the events.

6

expert. Respondents argued that the evidence of methamphetamine in Gonzalez's blood was relevant to explain issues of fact and credibility, and its exclusion would be prejudicial to respondents' ability to defend themselves at trial.

Supplemental briefing and supplemental declarations were filed, as appellants sought to exclude respondents' supplemental expert witnesses and the NMS Labs report. Respondents continued to oppose the motion. The trial court held multiple hearings on appellants' motions in limine. The first hearing, on March 29, 2019, covered drug evidence and the exclusion of respondents' expert witness, Dr. Clark. There were additional hearings on April 2, 2019, April 8, 2019, and April 9, 2019.

On April 10, 2019, respondents filed Middleberg's declaration along with supporting exhibits. Additional hearings took place on April 10, 2019, April 12, 2019, and April 15, 2019.

Following these extensive arguments, the trial court ruled that Dr. Clark could opine as to the effect of methamphetamine on Gonzalez's behavior, his ability to feel pain at the time of the incident, and whether Gonzalez's behavior was consistent with methamphetamine use, assuming a proper foundation was laid for the evidence. The court further ruled that Dr. Clark could rely on case-specific evidence. The court excluded any evidence of alcohol use before or during the incident, drug use prior to the date of the incident, and evidence of drug paraphernalia at the scene of the incident. The court also excluded all evidence of gangs and of Gonzalez's criminal history.

**Motion to exclude evidence of a dollar bill**

A dollar bill found on the ground near the scene of the shooting was folded in a manner that indicated its use with drugs. Respondents used the dollar bill as a marker to orient

different images at the scene. Based on their concern that members of the jury might recognize the significance of the shape of the dollar bill and attribute it to Gonzalez, appellants argued that some of the images of the dollar bill should be excluded. The trial court allowed limited reference to the dollar bill, after recognizing the importance of the dollar bill as a landmark. The trial court found that the images showing the dollar bill were not unduly prejudicial, however, the court barred any reference to drug use in relation to the dollar bill and instructed the parties to only refer to it as money on the ground.

**Dr. Clark's testimony at trial**

Dr. Clark's ability to testify regarding the levels of methamphetamine in Gonzalez's system during the incident depended upon the admissibility of the toxicology report. Respondents supported the admissibility of the toxicology report with the Middleberg declaration, which included a certificate of authenticity and chain-of-custody documents. Respondents also relied on appellants' expert, who testified that he was familiar with NMS Labs, knew it as a reputable lab, and had no reason to dispute any of the numbers in the NMS Labs report.

On April 15, 2019, Dr. Clark testified based on the laboratory reports provided to him, that Gonzalez had methamphetamine in his system at the time of his death. Dr. Clark further testified as to the type of behavior methamphetamine causes, such as "[v]iolence, agitation, psychosis, anger, paranoia." Dr. Clark also provided his observation of individuals he has personally treated in the emergency room who are under the influence of methamphetamine. Based on Dr. Clark's knowledge of what is considered to be a recreational level of -methamphetamine, he

8

testified that the amount of methamphetamine in Gonzalez's system was "quite high." Dr. Clark added that the methamphetamine would have affected Gonzalez's behavior because "the level is quite high. It's about ten times higher than—" At this point, appellants' counsel objected. The trial court sustained the objection and instructed the jury "to disregard the evidence that it's about ten times higher than the recreational, based on lack of foundation." Appellants' counsel then argued that appellants were "irreparably prejudiced" in spite of the trial court's striking of the statement.

**Verdict and notice of appeal**

On April 17, 2019, the jury rendered a verdict for respondents. On May 8, 2019, the judgment after special verdict after jury trial and notice of entry of judgment were filed. On July 3, 2019, appellants filed their timely notice of appeal.


## DISCUSSION

### I. Standard of review

A ruling by the trial court on the admissibility of evidence is reviewed for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) This standard applies to the trial court rulings at issue here, including the determination of whether a writing meets the requirements of a business record exception to the hearsay rule (*Exclusive Florists, Inc. v. Kahn* (1971) 17 Cal.App.3d 711, 716); whether there is sufficient foundation to support the introduction of evidence under the business records exception (*People v. Zavala* (2013) 216 Cal.App.4th 242, 245-246; *County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1450); and whether the information relied upon by an expert witness is of a type that reasonably may be relied upon by an expert in

9

forming an opinion upon the subject (*People v. DeHoyos* (2013) 57 Cal.4th 79, 128; *People v. Mickey* (1991) 54 Cal.3d 612, 687-688). Further, the trial court's ruling denying a motion to exclude evidence under Evidence Code section 352 is reviewed for abuse of discretion.[3] (*People v. Lucas* (1995) 12 Cal.4th 415, 449.)

Appellants argue that the trial court's rulings regarding the admission of drug evidence, including foundation, require a de novo standard of review. The de novo standard of review applies to mixed questions of law and fact when legal issues predominate. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.) It is appellants' position that some of the testimony that appellants sought to exclude, such as the opinions of Dr. Clark, were known by respondents from Dr. Clark's deposition and the trial court was making a purely legal determination regarding the admissibility of those opinions. Appellants argue that when the decisive facts on which the trial court makes its determinations are undisputed, the appellate court gives no deference to the trial court's decision and considers the matter anew.

In support of this argument, appellants cite *In re George T.* (2004) 33 Cal.4th 620, 632 (*George T.*), which involved the question of whether a juvenile made a criminal threat. The appellate court determined that the de novo standard of review applied to determine whether the juvenile made criminal threats in violation of Penal Code section 422. (*George T.*, at pp. 630-632.) Appellants also cite *People v. Tran* (2013) 215 Cal.App.4th 1207, 1217-1218. The cited portion refers to the review of

---

[3] All further statutory references are to the Evidence Code unless otherwise noted.

10

whether a statement against interest admitted under Evidence Code section 1230 "bore sufficiently particularized guarantees of trustworthiness to be admissible." (*Tran*, at p. 1218.) However, de novo review in this situation is limited to criminal matters where a potential violation of the confrontation clause is at issue. (*Lilly v. Virginia* (1999) 527 U.S. 116, 137 ["[W]hen deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause."].) Neither case suggests that the de novo standard of review is appropriate here.[4] Appellants have thus failed to convince us that the de novo standard of review is applicable in this appeal.

Appellants agree that trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) Under this standard, we measure "whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831.) "'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.'" (*Ibid.*) A trial court's error

---

[4]     *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791 and *Sulier v. State Personnel Bd.* (2004) 125 Cal.App.4th 21 also do not assist appellants' position. *Ghirardo* involved the question of the proper standard of appellate review as to whether a transaction is usurious. (*Ghirardo, supra*, at p. 799.) *Sulier* involved the interpretation of a statute. (*Sulier, supra*, at p. 26.)

11

is grounds for reversal only if it caused a miscarriage of justice. (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480.)

## II.    Evidence of drugs in Gonzalez's system

Appellants challenge the trial court's ruling on their motion in limine No. 3 for various reasons.  Among other things, appellants sought to exclude evidence that Gonzalez tested positive for methamphetamine postmortem and was under the influence of methamphetamine at the time of the shooting incident, arguing that this evidence was irrelevant and highly prejudicial.  In support of this argument, appellants cite sections 350 and 210, which mandate that only relevant evidence is admissible.[5]  Appellants also cite section 352, which provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Appellants point out that character evidence is inadmissible under sections 787 and 1101[6]

---

[5]    Section 350 provides that "[n]o evidence is admissible except relevant evidence."  Section 210 provides that "'[r]elevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

[6]    Section 787 provides that, generally, "evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."  Section 1101, subdivision (a), provides generally that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of

12

and argue that their motion in limine No. 3 should have been granted in order to "'avoid the obviously futile attempt to "unring the bell"'" when highly prejudicial evidence is offered and then stricken at trial. (*People v. Morris* (1991) 53 Cal.3d 152, 188, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

A.  *Relevance*

First appellants argue that the evidence of drugs in Gonzalez's system was irrelevant. They point out that CACI No. 1305 asks that the jury determine whether the officer used reasonable force by considering what "would have appeared reasonable under the same or similar circumstances." CACI No. 440, provides that the jury determine whether the officer used unreasonable force considering "what force a reasonable officer in defendant's position would have used under the same or similar circumstances." Appellants claim that drug test results that Officer Medina had not yet seen are irrelevant to this determination and point to federal law suggesting in similar cases that lower courts and juries are required to confine their inquiries to information known to the officer at the time of the shooting.[7] (*Graham v. Connor* (1989) 490 U.S. 386, 396 ["The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."]; *Glenn v. Washington County* (9th Cir. 2011) 673 F.3d 864, 873, fn. 8 [when determining

reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[7]    Appellants point out that Federal Rules of Evidence (28 U.S.C.), rule 403 is analogous to section 352.

13

whether officers used reasonable force in firing on teenager, "[w]e cannot consider evidence of which the officers were unaware"].)

Appellants rely on *Estate of Diaz* (9th Cir. 2016) 840 F.3d 592, 597 (*Diaz*). In *Diaz*, a police officer shot and killed an unarmed gang member. Diaz's estate and his mother brought civil claims for noneconomic damages against the City of Anaheim and the officer involved. The plaintiffs sought to exclude evidence of Diaz's gang affiliation, photographic evidence from Diaz's cell phone showing a weapon, and toxicology evidence of methamphetamine in the decedent's system at the time of the shooting. (*Ibid.*) The district court ultimately ruled that the toxicology evidence was relevant to damages, but not relevant to liability, as the officer involved did not know or suspect that Diaz was under the influence of drugs at the time of the incident. (*Id.* at p. 600.) In determining that the district court erred in failing to bifurcate the liability phase of trial from the damages phase of trial, the Ninth Circuit noted that the evidence had a "singular focus" on "Diaz's toxicological status on the day he was shot." (*Ibid.*) Diaz's "drug use on the day of the incident and how it may have affected his behavior, . . . had *no* relevance to his mother's loss." (*Ibid.*) The city's toxicology expert[8] discussed the high levels of methamphetamine in the decedent's blood at the time of his death and opined that the methamphetamine may have affected the decedent's behavior on that day. (*Ibid.*) The expert testified that "[f]rom my review of the facts in this case, it's possible that methamphetamine at the levels of which were measured at autopsy could have caused Mr. Diaz to use poor

---

[8]     The expert witness in *Diaz* was the same Dr. Clark who testified in this case.

judgment in what ended up happening in this case." (*Ibid.*) The district court granted plaintiffs' motion to strike that part of the testimony. The Ninth Circuit noted that this was the second time the expert's testimony had been stricken because he improperly speculated as to how drug use may have affected Diaz's behavior on the day of the shooting. The court noted, "[e]ven after his earlier testimony was 'stricken,' [the expert] continued to focus on the day of the incident." (*Id.* at p. 601.)

In reversing and remanding for a new trial, the Ninth Circuit noted, among other things, that "the evidence presented regarding [Diaz's] drug use on the day of the incident was unduly prejudicial in light of the decision not to bifurcate. . . . The focus on the day of the incident was minimally probative of damages, and was highly likely to influence improperly the jury's evaluation of [the officer's] use of force, when he never suggested that he thought Diaz may have been intoxicated." (*Diaz, supra*, 840 F.3d at p. 602.)

The matter before us is distinguishable because Officer Medina testified that he believed Gonzalez was intoxicated. At the March 29, 2019 hearing on appellants' motion to exclude the evidence of drugs in Gonzalez's system at the time of his death, the trial court acknowledged the *Diaz* case but observed "if Officer Medina reasonably believed that Omar Gonzalez was under the influence of drugs or alcohol . . . based upon Omar Gonzalez's behavior, he is allowed to testify to that during his trial." The court found: "It's whether or not Officer Medina's perceptions were reasonable, whether or not he acted reasonable under the circumstances of this case." Thus, the court concluded,

15

the evidence should be "allowed because of [Officer Medina's] beliefs based upon Omar Gonzalez's behavior."[9]

Appellants further argue that the evidence that Gonzalez had drugs in his system was irrelevant because many of the events that Officer Medina observed were captured on Officer Medina's BWV.  In support of this argument, appellants cite *Scott v. Harris* (2007) 550 U.S. 372 (*Scott*).  In *Scott*, an individual, who fled from police and engaged them in a dangerous high speed pursuit, sued for violations of the Fourth Amendment after he was injured when one of the officers engaged in a maneuver to bring the suspect's vehicle to a stop.  (*Id.* at pp. 375-376.)  In qualified immunity summary judgment cases such as *Scott*, the courts normally adopt the plaintiff's version of the facts.  However, the *Scott* court emphasized that there was "the record of a videotape capturing the events in question," and the videotape "quite clearly contradict[ed] the version of the story told by [the suspect]."  (*Id.* at p. 378.)  The suspect's "version of

---

[9]     At the hearing, appellants pointed to deposition testimony of Officer Medina, which, appellants suggested, contradicted his testimony at trial.  At his deposition, Officer Medina was asked, "Did you know anything about whether he had any drugs in his system?"  Officer Medina responded, "I did not know."  Appellants pointed out to the court that Officer Medina did not respond, "Well, I thought that he did."  However, Officer Medina never testified that he *knew* that Gonzalez had drugs in his system—he testified that he *believed* Gonzalez had drugs in his system, based on his behavior that night.  The deposition testimony did not provide a basis to exclude the evidence.  The deposition testimony was available to appellants for cross-examination of Officer Medina.

16

events [was] so utterly discredited by the record that no reasonable jury could have believed him." (*Id.* at p. 380.)

*Scott* does not suggest that under all circumstances video footage must be the only evidence relied upon in determining whether an officer's actions were reasonable. In *Scott*, which was decided on summary judgment, the video footage permitted judgment in favor of the officer because a jury could not reasonably believe a version of events that so clearly contradicted the video. The circumstances before us are different. This matter proceeded through a full trial, at which Officer Medina's BWV footage was just one of the forms of evidence presented to the jury. There is no suggestion that anyone's testimony contradicted the video footage to any significant degree. Instead, testimony was necessary to fill in details about the events surrounding the shooting. We therefore reject appellants' argument that the BWV footage undermined the relevance of the other evidence provided at trial.

As set forth above, Officer Medina testified at various times that he suspected that Gonzalez was under the influence of drugs due to Gonzalez's actions during the car chase, during his flight up the driveway and his engagement in an altercation with the neighbors, and during the officers' attempts to handcuff him.[10] The evidence that Gonzalez had drugs in his system during these events was relevant to support Officer Medina's actions and credibility, which were central to respondents' defense. Thus, the evidence was probative while not unduly prejudicial.

---

[10] The court, having observed the BWV, described this as a "very violent struggle that took place before the shooting."

17

### B. *Prejudicial character evidence*

Appellants argue that the evidence of methamphetamine in Gonzalez's system was highly prejudicial character evidence, therefore it was error to allow such evidence to be admitted. Appellants rely on *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452 (*Hernandez*), disapproved on other grounds in *People v. Freeman* (2010) 47 Cal.4th 993, 1006, footnote 4. In *Hernandez*, the character evidence was undocumented (or "illegal") immigration status. The plaintiff sued a doctor for medical malpractice, and the trial court denied his motion in limine to exclude evidence of his alienage and psychological condition. (*Hernandez*, at p. 455.) In reversing the jury verdict below, the appellate court noted that "the [trial] court absolutely should have granted plaintiff's motion to exclude reference to his residency status. Only relevant evidence is admissible." (*Id.* at p. 460.) Appellants argue that the evidence at issue here was even more prejudicial than that at issue in *Hernandez*. Appellants cite *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*) for the proposition that the evidence was also inadmissible under sections 787 and 1101.[11]

---

[11]     *Ewoldt* involved an exception to the rule against admission of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition. (*Ewoldt, supra*, 7 Cal.4th at p. 393.) The *Ewoldt* court held that evidence of a defendant's uncharged similar misconduct is admissible where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan. (*Id.* at p. 402.) The case does not advance appellants' argument here.

18

The distinction here is the relevance of the testimony. In *Hernandez,* the appellate court noted that the Legislature had made it clear in various statutes its public policy concerning the issue of immigration status, which is that immigration status is irrelevant when it comes to enforcing the state's labor, employment, civil rights, and employee housing laws. (*Hernandez, supra*, 109 Cal.App.4th at pp. 460-461.) Similarly, in the medical malpractice case at hand, the evidence was irrelevant to the issue of the doctor's liability. (*Id.* at p. 460.) In contrast, as explained above, the evidence that Gonzalez was under the influence of methamphetamine at the time of the incident was relevant to corroborate Officer Medina's actions and credibility and was therefore pertinent to respondents' defense.

Further, we note that the trial court did, in fact, exclude prejudicial character evidence. As set forth above, the court excluded all evidence of Gonzalez's gang affiliations and gang history, as well as evidence of his criminal history and any drug paraphernalia found at the scene of the shooting. The trial court's decision to admit the limited evidence of methamphetamine in Gonzalez's system at the time of the shootings was within the realm of the court's discretion.

III. **Expert testimony**

A. *Dr. Clark*

Appellants make two general arguments regarding Dr. Clark's testimony: first, that Dr. Clark's testimony lacked medical probability under *Diaz*; and second, that Dr. Clark's

19

testimony did not meet the *Kelly/Frye*[12] test regarding the admissibility of expert testimony.

Appellants argue that they presented the *Diaz* case to the court and noted to the court that Dr. Clark was the expert in that case and his testimony there was described as "lacking in medical probability." Appellants point out that what was more shocking in the *Diaz* case was that the witness, Dr. Clark, "continued to testify to areas that had been stricken by the trial judge." Appellants argued that the best way to avoid this problem at trial would be to exclude Dr. Clark's testimony altogether because "he has shown no ability to abide by a cautionary ruling by a trial judge." Appellants argued that the trial court should view the *Diaz* case as a "cautionary tale." However, the trial court noted that the present matter was distinguishable from the *Diaz* case. The court permitted Dr. Clark to testify but stated that it would limit Dr. Clark's testimony. Appellants take the position that Dr. Clark should not have been permitted to testify and none of the evidence he presented should have been before the jury.

### 1. *Dr. Clark's testimony*

On April 15, 2019, Dr. Clark testified. He had been previously asked to review the records showing that Gonzalez used methamphetamine on the day of his death and had methamphetamine in his system at the time of the autopsy. Dr. Clark testified that methamphetamine "often causes irrational-type behavior that is out of a person's normal behavior," including "[v]iolence, agitation, psychosis, anger, [and] paranoia." Appellants argue that Dr. Clark relayed to the jury

---

[12]     *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013, 1014 (*Frye*), and *People v. Kelly* (1976) 17 Cal.3d 24, 30 (*Kelly*).

case-specific hearsay as to what blood was tested and opined that the amount of methamphetamine found in Gonzalez's system was quite high. After the court sustained an objection, Dr. Clark was not permitted to testify as to whether the level of methamphetamine found in Gonzalez's blood would have affected his behavior. However, Dr. Clark was then asked, "Did you find that it affected Mr. Gonzalez?" Dr. Clark responded, "My belief is that it did prevent—"

Subsequently, respondents' counsel asked Dr. Clark: "Why do you believe that it affected his behavior?" Dr. Clark responded, "Well, the level is quite high. It's about ten times higher than—" At that point, appellants' counsel inserted an objection for lack of foundation and moved to strike Dr. Clark's testimony based on *Kennemur v. State of California* (1982) 133 Cal.App.3d 907 (*Kennemur*).[13] The trial court sustained the objection on the basis of lack of foundation and granted appellants' motion to strike the testimony. However, appellants argue that the trial court then emphasized the same testimony to the jury, stating, "And the jury is to disregard the evidence that it's about ten times higher than the recreational, based on lack of foundation." Appellants argue that the "bell had been rung repeatedly and could not be unrung."

Appellants assert that this is the same improper testimony that was stricken in *Diaz.* Appellants argued to the trial court that respondents' strategy was to state the testimony, knowing it

---

[13] *Kennemur* held generally that a party must disclose the substance of an expert witness's expected testimony, and offer him for deposition, to allow the other party to prepare for cross-examination and rebuttal. (*Kennemur, supra*, 133 Cal.App.3d at pp. 918-919).

21

would be stricken, in order to  get the improper information in front of the jury.  Appellants argued that they were irreparably prejudiced.

Dr. Clark continued his testimony, opining that Gonzalez's methamphetamine use caused or contributed to causing the specific behavior that Gonzalez exhibited in this case, including a failure to comply with police commands; refusal to give up his gun when commanded to do so; and struggling with police.  In spite of the trial court's earlier ruling, respondents' counsel again asked Dr. Clark how much methamphetamine Gonzalez would have had to have in his system to reach the levels observed postmortem.  Appellants' objections to this question were sustained, but appellants argue that through the inappropriate questions, respondents sought to plant in the jury's mind that there was an inordinately high amount of methamphetamine in Gonzalez's system.

**2.** Diaz

Appellants argued to the trial court that *Diaz* "exposed Dr. Clark's testimony for what it really is," i.e., improper evidence of drug use lacking in medical probability.  Appellants point out that Dr. Clark admitted he starts with his "lay opinion" that the individual in question exhibited poor judgment, then testifies that what caused the poor judgment was the methamphetamine in the individual's system.

The trial court disagreed with appellants' interpretation of the *Diaz* case, stating that the *Diaz* court was critical of defense counsel and the witness for going beyond the scope of the question that was asked.  The trial court found that Dr. Clark's qualifications as a specialist in emergency medicine and toxicology with several decades of experience in treating and

22

observing methamphetamine patients met the requirements of section 720. Further, appellants' counsel had the opportunity to vigorously cross-examine Dr. Clark as to his opinions, and they took advantage of this opportunity.

We agree that the criticism of Dr. Clark's testimony in *Diaz* stemmed from different circumstances than were present before the court in this matter. Because the police officer in question "never suggested he thought Diaz may have been intoxicated" (*Diaz, supra*, 840 F.3d at p. 602), the issue of Diaz's intoxication level on the day of the shooting was irrelevant. Therefore, evidence of the decedent's methamphetamine use was relevant only to the question of damages, "because it supposedly undermined his mother's claim that she loved her son." (*Id.* at p. 600.) The discussion in *Diaz* therefore starts with the premise that Diaz's specific intoxication level on the day he was killed had no relevance whatsoever. As the Ninth Circuit explained, "the evidence at trial fixated on his drug use on the day of the incident and how it may have affected his behavior, which had *no* relevance to his mother's loss." (*Ibid.*) The Ninth Circuit found that "even if evidence of Diaz's drug use were relevant to damages, the form and nature of the evidence presented regarding his drug use on the day of the incident was unduly prejudicial in light of the decision not to bifurcate." (*Id.* at p. 602.) The court suggested it would have been "far more relevant to damages for an expert to testify simply to the presence of drugs in Diaz's body and to the effects of drug use on relationships." (*Ibid.*)

We find in *Diaz* no suggestion that the testimony of Dr. Clark, in general, lacks medical probability. The trial court

did not abuse its discretion in finding *Diaz* distinguishable from the matter before it.

### 3. Kelly/Frye

California courts apply the *Kelly/Frye* test in determining whether expert witness testimony regarding scientific evidence is admissible. (*People v. Shirley* (1982) 31 Cal.3d 18, 51-57, citing *Frye, supra*, 293 F. 1013 and *Kelly, supra*, 17 Cal.3d at p. 30.) The *Kelly/Frye* test is a "special restriction[] governing admission of new, novel, or experimental scientific techniques not previously accepted in the courts." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1140-1141.) Under the *Kelly/Frye* test, a proponent of novel or experimental scientific evidence must show that the expert's methodology has gained general acceptance within the scientific community and that the witness is qualified to render an expert opinion. (*People v. Leahy* (1994) 8 Cal.4th 587, 591.)

The *Kelly/Frye* test is applicable only to "'new scientific techniques.'" (*People v. Leahy, supra*, 8 Cal.4th at p. 605.) Such techniques include polygraph examinations, a truth serum, experimental systems of blood typing, and voiceprint analysis, among others. (*People v. Shirley, supra*, 31 Cal.3d at pp. 51-52.) Appellants fail to explain what novel scientific technique they found objectionable in this case. Appellants argue, without citation to authority, that the idea that methamphetamine or amphetamine causes certain behaviors without any consideration of route of administration, time of administration, or tolerance of user has not gained general acceptance in the scientific community.[14] Appellants argue that while there is disputed

---

[14]    In support of this argument, appellants cite *People v. Guerra* (1984) 37 Cal.3d 385, 418, noting that the general acceptance portion of the *Kelly/Frye* test is met if "the technique

24

literature that methamphetamine can cause certain effects, there is no basis for Dr. Clark's opinion that it did cause such effects in this case.

Dr. Clark's testimony regarding the effects of methamphetamine was based on his extensive experience as an emergency room physician and toxicologist. He had extensive personal knowledge and experience regarding the treatment of methamphetamine patients and the effects of methamphetamine use and abuse on those patients. While Dr. Clark's decades of experience provided a sufficient basis for him to testify regarding the effects of methamphetamine, his testimony was open to cross-examination. Appellants extensively cross-examined Dr. Clark and at that time were able to address the shortcomings of Dr. Clarks' testimony—i.e., that he had limited knowledge of the specifics of Gonzalez's ingestion of methamphetamine, that he had no personal knowledge of the direct correlation between Gonzalez's ingestion of methamphetamine and his behavior on the date in question, and he had a lack of formal scientific studies in this area.

Appellants cite as persuasive authority *In re Accutane Products Liability* (2007) 511 F.Supp.2d 1288 (*Accutane*).[15] In

---

is supported by a clear majority of the members of that [scientific] community." *Guerra* involved the use of hypnosis as a forensic technique. It does not support appellants' position that any novel scientific technique was used in this case.

[15] Appellants acknowledge that *Accutane* is a federal case that relies on *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 rather than *Kelly/Frye*. Appellants ask that we consider the case as persuasive authority because the reasoning is persuasive in this matter.

*Accutane,* a gastroenterologist opined that inflammatory bowel disease (IBD) is caused by the acne medication Accutane. (*Id.* at p. 1289.) In undertaking an analysis to determine the admissibility of the expert's opinion, the *Accutane* court conceded there was no issue as to the expert's qualifications, as he was a board certified gastroenterologist for over 25 years. (*Id.* at p. 1290.) However, in reviewing the expert's methodology, the *Accutane* court found that it was not supported by sufficiently reliable data. (*Id.* at p. 1291.) After reviewing the doctor's data sources, the court concluded that while the doctor's theory was plausible, and maybe even correct, at the time of trial it "remain[ed] an educated guess." (*Id.* at p. 1296.) Appellants liken Dr. Clark's testimony to that of the expert in *Accutane*, stating that the *Accutane* expert relied on histories and anecdotal information, and lacked peer reviewed studies of his theory.

We find Dr. Clark's testimony to be sufficiently distinct from the *Accutane* expert's testimony. In *Accutane*, the expert was attempting to opine as to the cause of a disease. The expert admitted that while he had developed a biological theory as to how Accutane might cause IBD, he acknowledged that no one knows the exact biological mechanism by which IBD occurs. (*Accutane, supra*, 511 F.Supp.2d at p. 1295.) In contrast, Dr. Clark was not testifying as to the cause of a disease based on anecdotal evidence. Instead, he was testifying that, based on his experience as an emergency room doctor and toxicologist, methamphetamine causes certain behavior, and in his expert opinion, it may have caused or contributed to appellant's behavior on the night he was killed. While the *Accutane* expert's testimony was not supported by sufficiently reliable data, Dr. Clark's opinions were supported by his experience and

training after decades in the field.  Any faults in his opinions were properly subject to cross-examination.  We therefore find that the trial court did not abuse its discretion in declining to exclude the evidence under *Kelly/Frye*.

### B. *Middleberg*

Appellants argue that the trial court should not have permitted Middleberg, a nonretained expert from NMS Labs, to testify, as Middleberg was not listed in respondents' initial expert disclosure.  Appellants point out that respondents' initial disclosure failed to list anyone from NMS Labs, where the postmortem blood of Gonzalez was tested for methamphetamine.  Instead, Middleberg was listed in respondents' supplemental disclosure.

Appellants argue that Code of Civil Procedure section 2034.280 only permits a supplemental expert witness list if the list contains experts needing an expert witness declaration under subdivision (c) of Code of Civil Procedure section 2034.260.[16]  Because nonretained experts do not require an expert witness declaration, appellants argue, they must be listed in the initial expert witness disclosure.  The trial court rejected appellants' argument at trial, noting:

> "I've gone over [the statute], and I've gone over the case that has been referred to in this matter concerning the issue of whether a non-retained expert can be designated 20 days later as was done with a

---

[16] Code of Civil Procedure section 2034.260 provides protocols for the exchange of expert witness information.  Subdivision (c) of section 2034.260 provides that if any expert is a retained expert pursuant to section 2034.210, subdivision (b), "the exchange shall also include or be accompanied by an expert witness declaration," and provides the requirements of such a declaration.

27

retained expert.  I don't find anything that prohibits it."

The trial court allowed Middleberg to testify, but ordered that if Middleberg appeared, appellants be given up to two hours to complete his deposition in the jury room.  Middleberg was permitted to testify subject to the deposition.  Appellants note that respondents never produced Middleberg for deposition, and he ultimately submitted a declaration addressing the blood sample in lieu of appearing at trial.

Code of Civil Procedure section 2034.280 provides:

"(a) Within 20 days after the exchange described in Section 2034.260, any party who engaged in the exchange may submit a supplemental expert witness list containing the name and address of any experts who will express an opinion on a subject to be covered by an expert designated by an adverse party to the exchange, if the party supplementing an expert witness list has not previously retained an expert to testify on that subject.

"(b) This supplemental list shall be accompanied by an expert witness declaration under subdivision (c) of Section 2034.260 concerning those additional experts, and by all discoverable reports and writings, if any, made by those additional experts.

"(c) The party shall also make those experts available immediately for a deposition under Article 3 (commencing with Section 2034.410), which deposition may be taken even though the time limit for discovery under Chapter 8 (commencing with Section 2024.010) has expired."

The language of the statute does not restrict its application to retained experts. Subdivision (b) of section 2034.280, requiring expert witness declarations, pertains only to those experts for whom such a declaration is required. Further, *Kalaba v. Gray* (2002) 95 Cal.App.4th 1416 (*Kalaba*) does not support appellants' argument. In *Kalaba*, the medical malpractice plaintiff listed "'any and all [of her] past or present examining and/or treating physicians'" without listing them by name. (*Id.* at p. 1418.) On the day the parties answered "ready for trial," the plaintiff attempted to file a list of named nonretained experts. (*Ibid.*) The trial court granted the defendant's request to exclude these nonretained experts on the ground that they had not previously been designated. On the day the parties returned for court trial, the plaintiff named three of her treating physicians, whom she had not previously designated by name. Again, the defendant's motion to exclude these nonretained experts on the ground that they had not been previously designated was granted. (*Id.* at p. 1419.) Under the circumstances, although they were nonretained experts, the trial court did not abuse its discretion in excluding these nonretained experts because "the treating physicians [were] not listed or identified by name" but simply referred to as treating physicians. (*Id.* at p. 1423.) Thus, there was no compliance with the letter or spirit for Code of Civil Procedure former section 2034. (*Kalaba, supra*, at p. 1423.)

*Kalaba* does not support appellants' argument that respondents were not permitted to designate a nonretained expert in a supplemental disclosure. Middleberg was not retained for the purpose of forming an opinion for litigation, but was designated for his knowledge regarding the actual testing of Gonzalez's blood sample. Appellants have cited no authority

29

suggesting that respondents were not permitted to designate him in a supplemental designation as provided by Code of Civil Procedure section 2034.280.

Appellants further complain that respondents never produced Middleberg for deposition. However, upon questioning from the court on this issue, respondents noted that appellants never requested to take Middleberg's deposition. Further, appellants never sought relief during the discovery phase for respondents' failure to produce Middleberg. Finally, during respondents' deposition of appellants' retained forensic toxicologist, Dr. Okorocha, Dr. Okorocha revealed that he would not dispute the chain of custody records from NMS Labs. Under the circumstances, because appellants never sought his deposition and never complained below that he had not been produced, appellants cannot now complain that Middleberg was not produced for deposition.

## IV. Laboratory report and results

The NMS Labs test results showing methamphetamine in Gonzalez's blood at the time of his death were not submitted to the jury. Instead, the trial court allowed the test results only to the extent that expert witnesses were permitted to refer to them. Appellants laid the foundation for the admission of the laboratory test results through the declaration of Middleberg, who attested that the toxicology report was made in the regular course of business and there was no particular delay between testing the blood samples and receiving the results. Eskandary, the records custodian, signed the certification of authenticity for the laboratory report and chain of custody documents.

Appellants argue that the laboratory test results were inadmissible hearsay under *People v. Sanchez* (2016) 63 Cal.4th

665 (*Sanchez*) and should have been excluded. Appellants argue that the blood samples were improper testimonial evidence and are not covered by a hearsay exception; they did not fall under the business records exception; and the declarations of Middleberg and Eskandary were insufficient to properly establish a foundation for the admission of the laboratory report at trial. We address each argument separately below, and conclude that the trial court did not abuse its discretion in allowing the laboratory report to be available for the expert witnesses for reference in support of their opinions.

**A.** ***The laboratory results were properly admitted under the business records exception to hearsay***

Section 1271 provides that evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when "(a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." The admissibility of a particular record depends on a case-by-case analysis of the circumstances of each record. (*People v. Zavala* (2013) 216 Cal.App.4th 242, 246 [finding that a printed compilation of cell phone data produced by human query for use at trial falls under the business records exception].) "'Where the trial court has determined that the foundation laid was sufficient to support the introduction of evidence under the business records exception, and the record reasonably supports this determination, its conclusion is binding on the appellate court.'" (*Id.* at pp. 245-246.)

31

Laboratory results may be admissible as business records even when the lab technician who actually performed the test is unavailable. (*County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1448 (*County of Sonoma*) [finding that laboratory's paternity test results were admissible under the business records exception due to testimony establishing chain of custody, despite the fact that the technicians who received and tested the samples did not testify and were not available for cross-examination]; see *Nichols v. McCoy* (1952) 38 Cal.2d 447, 448-449 [finding that blood sample confirming elevated alcohol levels was properly admitted under the business records exception where coroner testified as to procedures followed in taking blood samples although embalmer had no personal knowledge of the identity of the decedent].)

"The object of . . . section 1271 is to eliminate the calling of each witness involved in preparation of the record and substitute the record of the transaction instead." (*County of Sonoma, supra*, 187 Cal.App.3d at p. 1451.) "'"'It is not necessary that the person making the entry have personal knowledge of the transaction.'"'" (*Ibid.*; see *Estate of O'Connor* (2017) 16 Cal.App.5th 159, 170 ["[A] qualified witness need not be the custodian, the person who created the record, or one with personal knowledge in order for a business record to be admissible under the hearsay exception."].) Contrary to appellants' arguments, Middleberg and Eskandary did not need to have personal knowledge of the accuracy of the report. Instead, the inquiry becomes whether the proffered foundational evidence exhibits "inherent reliability, accuracy, and trustworthiness." (*County of Sonoma, supra,* at p. 1451.)

The trial court did not abuse its discretion in determining that sufficiently reliable foundational evidence existed in this

32

case. As attested to by Middleberg, NMS Labs regularly conducts toxicologic analyses based on the blood samples sent from the Los Angeles County Coroner's Office. Thus, it was acting in the regular course of its business when it received the sample from Gonzalez's body. The test results were "generated in the normal course of business by employees of NMS Labs." Middleberg testified that there was no particular delay involved between the laboratory's testing and reporting of the results, and that such results were automatically computer generated at the time of testing and stored in an electronic file with an associated workorder number. Middleberg, as the laboratory director of NMS Labs, had personal knowledge of the standard testing practices of NMS Labs. Further, appellants' own expert confirmed that NMS Labs was a reliable laboratory and he had no reason to dispute the results of the testing in this case.

We therefore conclude that the trial court did not abuse its discretion in determining that the laboratory report was sufficiently reliable to be admissible under section 1271.[17]

---

[17] For the first time in their reply brief, appellants assert that respondents did not submit the correct declaration required under section 1561 and *People v. McVey* (2018) 24 Cal.App.5th 405, 411-413. Appellants make this assertion without substantive argument regarding the chain of custody declaration submitted in this matter. We therefore decline to address this argument. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 ["'[I]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived.'"]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 ["'Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would

**B.** *The cases cited by appellants are inapplicable*

Appellants cite to several federal cases involving the federal constitutional right to confront witnesses. None of the cases undermines the trial court's proper exercise of discretion in this case. First, in *Sanchez, supra*, 63 Cal.4th 665, an expert witness testified as to the defendant's gang membership based on inadmissible hearsay evidence, which was presented as fact without the requisite independent proof. The *Sanchez* court concluded that in the context of a criminal prosecution, where a prosecution expert seeks to relate testimonial hearsay such as the hearsay at issue there, "there is a confrontation clause violation" in the absence of a showing of witness unavailability or a prior opportunity for cross-examination. (*Id.* at pp. 685-686.) The matter before us is distinguishable as it is not a criminal prosecution, does not involve the confrontation clause of the federal Constitution, and instead involves cross-examination of a qualified witness regarding business records in a civil case.[18]

*Bullcoming v. New Mexico* (2011) 564 U.S. 647 (*Bullcoming*) similarly involved a criminal prosecution for driving while intoxicated (DWI). The key evidence against the petitioner was a forensic laboratory report certifying that the defendant's

---

deprive the respondent of an opportunity to counter the argument.'"].)

[18] Appellants argue in their reply brief that this aspect of *Sanchez* is, in fact, applicable in civil cases. However, the one civil case appellants cite for this proposition was a case in which the *Sanchez* argument was forfeited due to the appellant's failure to raise a hearsay objection below. (*David v. Hernandez* (2017) 13 Cal.App.5th 692, 704.) The case does not support appellants' position here.

34

blood alcohol level was well above the threshold for aggravated DWI. A forensic analyst named Caylor completed, signed, and certified the report. However, the prosecution neither called Caylor to testify nor asserted he was unavailable; "the record showed only that Caylor was placed on unpaid leave for an undisclosed reason." (*Id.* at p. 659.) The *Bullcoming* court concluded that Caylor was more than a mere scrivener in the process, instead making representations as to how he received the sample; checked the sample; adhered to protocols, etc. (*Id.* at pp. 669-660.) Under the circumstances, the confrontation clause required that the accused be given the right to confront the analyst who made the certification unless that analyst was unavailable or the accused had an opportunity to cross-examine him. (*Id.* at p. 663.) Again, the confrontation clause is not applicable in this civil matter.[19]

---

[19]     *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 was a criminal prosecution for distribution of cocaine involving the admissibility of a certificate of analysis showing results performed on seized substances. Petitioner objected to the admission of the certificate, asserting that under the confrontation clause, the analysts must testify in person. (*Id.* at p. 309.) The *Melendez-Diaz* court concluded, in keeping with the other cases discussed above, that the analysts' statements were testimonial statements, and the analysts were witnesses for the purpose of the Sixth Amendment. Thus, absent a showing that the analysts were unavailable to testify at trial, the petitioner "was entitled to '"be confronted with"' the analysts at trial." (*Id.* at p. 311.) The court noted that the analysts' certification was not a business record because it was not a traditional official or business record but was instead created "for the sole purpose of providing evidence against a defendant." (*Id.* at pp. 322-323.)

Finally, appellants point to *Conservatorship of S.A.* (2018) 25 Cal.App.5th 438 (*S.A.*) for the proposition that the laboratory results should have been redacted before being admitted for use by the experts in this case. (*Id.* at pp. 442, 447.) The testimonial records in *S.A.* were psychiatric records. The records were redacted to remove "conclusions, opinions, and remote or immaterial matters." (*Id.* at p. 442.) The *S.A.* court concluded that the psychiatric records were not inadmissible hearsay and a psychiatrist's reliance on the records at trial did not violate the conservatee's rights because the psychiatrist "did not relate any prejudicial case-specific facts not independently proven by admissible evidence." (*Id.* at p. 447.)

Appellants argue that redactions of conclusions and opinions should have similarly been made to the NMS Labs report. However, the extent of the redactions, and the specific nature of the redactions, is never discussed in detail in *S.A.* Thus, while *S.A.* confirms that medical records may be considered business records for the purposes of section 1271 (*S.A., supra*, 25 Cal.App.5th at pp. 447-448), it does not provide guidance as to any redactions that should have been made in this case. Further, the medical records in *S.A.* were both read to the jury and provided to the jury for the purpose of determining a conservatorship. (*Id.* at pp. 442-443.) Here, in contrast, the laboratory report were not read to, nor provided to, the jury, but were only available for use by the parties' experts. *S.A.* does not undermine the trial court's admission of the laboratory reports

Gonzalez is not a criminal defendant, and the legal analysis has no relevance in the matter before us.

36

for this limited purpose under the business records exception. No abuse of discretion occurred.

## V.     Evidence of the folded dollar bill

Appellants claim that the trial court erred in admitting evidence of what appellants describe as "drug paraphernalia" in the form of a folded dollar bill. Appellants describe the dollar bill, seen on the ground in the BWV shown to the jury, as a "characteristic bindle that traditionally contains cocaine." Respondents argued at trial that the money on the ground was necessary to use as a point of reference for the jury to orient them as they observed the events. Appellants argued to the trial court that the folded bill would suggest to some jurors that Gonzalez was a drug dealer and was therefore highly prejudicial.

In responding to the parties' arguments, the trial court acknowledged that it had to weigh the interests of appellants "in being able to have the court uphold the ruling on the motion in limine to exclude evidence concerning a dollar bill, drug paraphernalia, possible cocaine, versus the interest of Officer Medina, who wants to be able to put on an adequate defense to protect his interest . . . ." The court initially asked that the parties not publish the dollar bill to the jury, but only show the witnesses the necessary evidence. The court stated, "at this time, I'll allow it, not publish it and not refer to it as anything other than the money on the ground . . . as opposed to a dollar bill, just the money on the ground . . . ." The court noted that it would "see how it develops from there," and consider the possibility that the item could be moved and an X placed in order to remove the dollar bill before the video and photographic evidence went to the jury. The court later allowed the jury to observe the money on the ground as a landmark in viewing photographic evidence.

There was no suggestion that Gonzalez was the source of the money nor any suggestion that the dollar bill was related to drug use.

The trial court properly weighed the competing interests at stake and reached a determination that was well within its discretion. Appellants' somewhat speculative fear that the dollar bill would suggest to the jury that Gonzalez was a drug dealer was alleviated by the court's permitting only limited reference to the money and only as necessary to orient the visual evidence. Appellants fail to cite any authority suggesting unfair prejudice from the trial court's ruling and fail to show an abuse of the court's discretion.

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

_____, J.
CHAVEZ

We concur:

_____, P. J.
LUI

_____, J.
HOFFSTADT